Tilghman, C. J.
The first error assigried in this cause, is the rejection of the evidence of John T. David, a witness produced on the part of the plaintiffs, Andrew Curcier and others. It was proved that David was a clerk in the house of the plaintiffs, and was to receive by way of compensation for his services, either one-fifth, or one-sixth of the profits, without being subject to losses. Under these circumstances, he was held to be incompetent, because interested, although he had executed a release to the plaintiffs, before he was offered as a witness. I shall not now inquire whether the receiving a share of the profits did not place David in the situation of a partner as to creditors. But assuming, for the sálte of the argument, that he might be a dormant partner, it remains to be considered in what manner hé was interested in the event of this suit. If he had not released to the plaintiffs, he would have been clearly interested, because a recovery in this action would have increased the profits of the firm, and consequently it would have increased the share of the witness. But it is said that he was interested notwithstanding the release, because he was responsible for the debts of the firm, and if the plaintiffs fail in this suit, the fund for payment of debts will be diminished. But this is too remote and contingent an interest, to affect the competency of a witness. There was no evidence of the inability of the other partner, to pay the debts of the firm, and therefore it was altogether uncertain whether David would ever be called on. This very point was decided by the Circuit Court of the United States, in Willing v. Consequa, (1 Peters, 301,) and I agree with the opinion delivered in that case. The interest is not of that direct and immediate kind, which the law requires, to incapacitate a witness. It is an objection which goes to his credit, but not his competency. I am of opinion, therefore, .that the evidence of David was improperly rejected,
*55 Error was assigned also in the charge of the District Court, and as this cause is to go to a second trial, it is necessary that we should give our opinión on the charge.. There was no special verdict, but the charge was given on the facts proved by the evidence of the witnesses. As those facts appeared to the District Court, and as they appear to me, the defendant had in his possession, in the year 1817, a quantity of coin, which he supposed to be current money of Cayenne. In the same year, he offered to give this coin to the plaintiffs for goods. The plaintiffs, being ignorant of the value of such coin, asked time for inquiry, and having taken several days for that purpose, during which they satisfied themselves, they bargained with the defendant, and sold and delivered him a certain quantity of goods, for which they received the coin.. The plaintiffs having kept it three years, were informed that it was spurious, upon which, without offering to return it to the defendant, they brought this action against him for money had and received for their use. There was no suggestion of fraud in the defendant. But the plaintiffs,endeavoured to support their action on this principle, — that they sold their goods to the defendant for a certain sum to be paid in foreign money, and the money being counterfeit, the contract was void. It is evident, that in taking this ground they assume an important fact, denied by the defendant, viz. that he agreed to pay a certain sum in foreign money. On this state of the case, I should not differ from the plaintiffs’ counsel. But the transaction appears to me to be rather in the nature of an exchange of the property. The plaintiffs gave goods, for which they received from the defendant in exchange a copper coin, which both parties supposed to be genuine money of Cayenne. The plaintiffs exercised their own judgment for several days in ascertaining the value of this coin; and finally received it on their own judgment, without any warranty or engagement on the part of the defendant. They kept it for three years, and even then did not offer to return it to the defendant, as I incline to think, though I have not formed a decided opinion, they ought to have done; for, whether lawful coin or not, being of copper, it had an intrinsic value. Besides, the delay of three years was unreasonable. If it had been returned in a short time after its receipt, the defendant might perhaps have had recourse to the person from whom he received it. But after three years, that was hardly to be expected. As to the excuse of the plaintiffs, that they had no opportunity, sooner, of ascertaining that the coin was counterfeit, it is not satisfactory. It was their business to make inquiry sooner, and it is not perceived that there could have been any difficulty in ascertaining the nature of the coin. I agree,-that if one sells goods, for bank notes of another state, which prove counterfeit, he may avoid the contract and recover his money. But even there, where the case is much stronger than that before iis, notice must be given in a reasonable time. I do not think an action for money had, *56 &c. would lie after three years, if the plaintiff knew where the defendant was to be found in the meantime. Nor would it be taken for a good excuse, if the plaintiff should say, that he had kept the notes in his closet, without an opportunity of knowing that they were counterfeit. It was decided by this court, in the case of Raymond v. Baar, at Chambersburg, last October Term,* that the plaintiff, who had received a counterfeit bank note for goods sold, and kept it six months, after he knew it to be counterfeit, without giving notice to the defendant, could not support his action. There, to be sure, the plaintiff knew that the note was counterfeit six months before he informed the defendant of it. But the case before us appears to me to be quite as strong, because, instead of six mouths the plaintiff kept the coin three years, long before the end of which time he might, ,and ought to have known that it was spurious. There is no need of entering into a minute examination of every part of the charge of the District Court. In the main conclusion, that on the evidence given the plaintiffs were not entitled to a verdict, I think it was right. The judgment must be reversed, however, for the error in rejecting the evidence.of John T. David, and a venire facias de novo awarded.
Gibson, J.
Where there is a sale on terms of. receiving payment in foreign coin, generally, I agree that payment in counterfeit coin will not discharge the debt; and this is all that can be demanded-in the way of concession. But was this transaction a sale of goods, to be paid for in foreign coin generally, or an exchange of goods for particular pieces of foreign coin, article for article? The defendant proposes to sell a cask of Cayenne money, or exchange it for goods, and leaves samples with the plaintiffs, who after satisfying themselves of its value, agree to give goods at the current prices to the amount; and, on this footing, a bargain is struck. Now, it is difficult to determine whether the plaintiffs took the Cayenne money in payment of their goods, or the defendant took the goods in payment of his Cayenne money; but that the identical .pieces of coin to be received for the goods, were fixed by the agreement of the parties, is not to be doubted; and that is conclusive to show that they meant to treat the Cayenne money, in every other re-speet than the name, as an article of commerce. The agreement was not, that the defendant should buy goods to be paid for in the coin of a particular country, at the current rate of exchange, but the identical pieces were specified, examine’d, and received at á value fixed by the parties themselves. If, then, they thought fit to treat this coin as a commodity, might they not invest it with the attributes and properties of a commodity ? That it presents itself to the senses in the shape of coin, furnishes no objection; for *57 the Nuremberg counters, so common at card tables a few years back, although in the shape of guineas, and little more base in their composition than the genuine coin of Cayenne, were undoubtedly a commodity. Nor is it material that this money was the counterfeit presentment of the coin of an obscure country in a remote corner of the world. The gum of the kingdom of Senegal is its only currency; yet with us, it enters into the transactions of commerce exclusively as a commodity.; and no one will doubt that payment in gum not merchantable would, even in Senegal, discharge the debt; and so would payment in tobacco have done, while it was the circulating medium of Maryland and Virginia. But I go further, and affirm that the Coin struck at the mint of the United States, may be divested of the character of money and bargained for as a commodity. The reason why payment in money which is counterfeit, or for any other cause worthless, does not discharge the debt, is that the seller has not got the thing for which he. bargained; but it cannot be affirmed that he has not got it, when the identical thing is produced, examined, and accepted at the time of the bargain. The current coin of the country, therefore, may, by an explicit agreement of the parties, be taken at the risk of the seller: but I admit that the presumption would be against the existence of such an agreement, till it were shown. However, in a transaction like the present, where warranty or deceit is not pretended, I am of opinion that the seller receives the thing at his own risk.
On the ground of authority I concur that John T. David was a competent witness, and, for that reason, that the. judgment be reversed.
Duncan, J.
To prove the contract, one David was offered as a witness,-r-his competency was objected to. It appeared that at the time the goods were sold, David had some interest in the plaintiffs’ firm, though his name did not appear as a partner. He put nothing in, nor had he authority to sign the firm’s name. His share of the profits for his services, as clerk, was one-fifth or one-sixth; it was by way of compensation. The witness released to the plaintiffs, and the court refused to suffer him to be examined, either on his voir dire or in chief. David, on this evidence, was elearly a dormant partner. A participation of profits and loss is one of the qualities of such partnership. In many parts of Europe limited partnerships are admitted; but by the law of England, which is in this particular, the law of Pennsylvania, it is otherwise; the rule being, that if a partner shares in the advantage, he shares in the disadvantage, but it is not necessary that the shares should be equal. Coope and others v. Byre and others, 1 H. Bl. 48. It is true, that a secret partnership can be no consideration to the vendee, yet, for reasons of policy and general expediency, the law is positive with respect to secret partners, that when dis *58 covered they shall be liable to the whole extent. But the witness being a dormant partner, the non-joinder of him as plaintiff is no ground of nonsuit. Lloyd v. Archbowle, 2 Taunt. 334. Wilson Wallace’s Executors, 8 Serg. & Rawle, 55. The objection is therefore to be maintained on the ground of interest. When the case of Mawman v. Gillett, was cited to prove the position, that a dormant partner without releasing could be received as a witness, I must own I was surprised, but on an attentive consideration of that case, it will be found not to establish the general position, because that was a case rather of sub-contract, than one of original partnership. Gow, (121,) states it as being decided on that principle. “ In an action,” says that author, referring to Mawman v. Gillett, 2 Taunt. 325, (note,) “ on a contract, a dormant partner, not being one of the contracting parties, and who has no privity of communication with them, on the subject of the contract, is competent to prove the contract.” That was a case where the ostensible proprietor of materials entered into a contract for work to be done thereon, and the witness had secretly purchased from him a share, but was no party to the contract. If there had been a solitary decision to the effect contended for, it could not prevail against the inflexible rule of evidence that interest renders any man an incompetent witness. The interest would have been direct, and the witness could not be received. His share of the profits would have diminished or increased according to the event of the trial; but I know not of any interest that a man cannot divest himself of by release. By releasing to the plaintiffs his share of all interest in this action, he released to them all share of the profits. If the plaintiffs succeeded, the witness reaped no benefit from their success; if they failed, he lost nothing, because he released all. And, as to the argument that he is liable to the creditors of the partnership, and that this would increase the fund for the payment of the debts, non constat that there are any, or any delicien-, cy; and the bare possibility of any action being brought against the witness, is no objection to his competency. Carter v. Penrose, 1 T. R. 164. Indeed, this objection falls within the reason of the decision of Willing v. Consequa, 1 Peters, 301, if not within its very letter. There it was held, that the possibility of a liability as a dormant partner was too remote, and certainly did not exclude him. And, as to the costs, if the plaintiffs were cast in the action, having accepted of the release, and taken the debt to themselves, he never could have recourse to the dormant partner for any share of the costs, and certainly the witness is neither directly nor by any circuity, accountable to the defendant for costs. It has been ruled, that a person who suffers his name to be used in a firm as partner, if in fact he is not so, nor has any share in the business or profits, may be a witness for the person who is joined with him, and who is the only person entitled, in an action for goods sold and delivered, to prove the contract. Parsons v. Crosby, 5 Esp. N. P. *59 C. 199. Grossop v. Colmer, 1 Stark. N. P. C. 25. In every aspect, the contingent liability was not more remote than it is in this case. In Clarke v. Carle, 3 Cowen, 84, it was held, that a dormant partner need not be a party to the suit, and, on releasing or selling his interest to his co-partner, he may be a witness for him. The witness ought to have been received. It was a simple question whether he was to be benefited by the decision. Having released, he could not receive a benefit, nor was he exposed to any loss. Judgment must be reversed, and a venire fa-cias de novo issued. It is made the duty, of the court, when a cause is remanded, to give their opinion on all the questions decided below and excepted to here.
Without relation to the form of action, indebitatus assumpsit for goods sold and delivered, and not on any warranty of the quality of the article received in satisfaction of the goods, or any fraud in the dealiug, could any action be supported ? And, if it could, can this be supported on the state of the evidence? It is certainly a new case. I do not think it is governed by the doctrine of warranty of quality, or sale of the goods. As I understand this case, it was a sale of goods, not for the current money of the country, but for the money of a foreign country. The defendant’called at the plaintiffs’ store, and said he wanted to sell or exchange Cayenne money for goods. The plaintiffs agreed to take Cayenne money, and goods were sold to him on his own selection, at the usual sale prices. A sample of money, as if genuine money,' was left at the store for the purpose of inquiring into its value as .money, not its quality as metal. If counterfeit, it could be of no more use than old copper, an article in which the plaintiffs did not deal as an article of commerce. Its intrinsic quality required no inquiry, — it was worth nothing. Tlje maxim, caveat emptor, has no relation to.such dealing. Without any particular warranty, there is an implied one in every such contract, that is, that the description is sufficient evidence of warranty. The plaintiffs had a right to expect a passable article, answering the description of Cayenne money, — a thing that would pass in the Cayenne market as money; but got a thing, which, if they*j]id pass it in that, market as money, would lead them to the gallows. He described it as Cayenne money, and accepted goods to the amount he said the Cayenne money was worth. In Young v. Jldams, it was a note payable in foreign bills, — bank notes. Bills were received, and the note given up. A five dollar bill was shortly afterwards discovered to be counterfeit. The foreign Ijgnk notes were considered as foreign coin, and it was held, that if due diligence is used, and they are returned seasonably to the payee the former demand revives, or the receiver becomes entitled to some equitable remedy for the deficiency of the intended payment, discovered by the event. The question of diligence and seasonable return depends on the special circumstances of each case, and this is a ease under very *60 uncommon circumstances. It was not submitted to the jury, whose province it was to decide on the negligence. Indeed, if the delivery had been made the next day, and communicated to the defendant, under the opinion of the court, the plaintiffs could not recover, because it did not appear, but that the plaintiffs knew the coin as well as the defendant; and, as there was no warranty or deceit, there could be no recovery. So that, taking the charge of the court as it must have been understood by the jury, it was, that if the money was spurious and bad, and the defendant did not know or assert it to, be genuine, he could not recover. It was not left to the jury to decide on the genuineness or falsity of the coin; but, whether genuine or not, still the plaintiffs could not recover. I am not of this opinion. This was a sale of goods, at the common rates for foreign money. I consider it as if the plaintiffs had taken the defendant’s notes for the price of the goods, payable in Cayenne money, and the defendant had given in payment this .brass or copper as true money, and there was no fraud committed by the defendant and no express undertaking. I think an action would lie, and would lie in this form. The principles of fair dealing require that a mistake of this kind,, after the mistake had been discovered and proved, should not be insisted on by the party who has the undue advantage, even when gained without any intention to defraud,. This was the opinion of the court in Young v. Adams, 6 Mass. Rep. 182, in a case not to be distinguished from this, which will be noticed hereafter. In Puckford v. Maxwell, 6 Term Rep. 52, the plaintiff agreed to accept a draft in payment. The draft was dishonoured, there being no fraud in the transaction. Lord Kenyon said, in cases of this kind, if the -bill which is given in payment do not turn out to be productive, it is not then what it purports to be, and what the party receiving it expects it to be;, and therefore he may consider it a nullity, and act as if no such bill had been given at all. The case of Owenson v. Morse, 7 T. R. 64, is very strong to the same effect. It was an action of trover for goods, brought against the tradesman who had sold them, and it was there held, if the seller of goods takes notes or bills for them, without agreeing to run the risk of the notes not being paid, and the notes turn out to be worth nothing, this will not be considered as payment. And Lord Kenyon thus strongly expressed himself: “This is an exercise of ingenuity on the part of the plaintiff, — it is an unjust attempt to take- from an honest tradesman certain goods, which the latter meant to sell.on receiving a fair price for them; and the question is, whether the tradesman shall be obliged to give them to the plaintiff without being paid for them. To be sure, if the law were with the plaintiff, we could only lament; but the law and justice of the ease are clearly with the defendant.”
This case has no relation to common articles of merchandize and the sale thereof. It was a disposition of foreign money, — coin bartered for goods, (I care not what name is given to the contract,) *61 at the selling price, and the thing taken as money of Cayenne, was that which never was the true coin of that country, and never passed as such, according to the testimony of one witness, if not more, — but at the risk of the neck of the party passing it. The vendor of the goods contracted for money — that which he got for his goods never was money current any where. There is great difference between an article whose value is intrinsical, and that whose value is not so, but depends on its being the representation of value. Money is a sign which represents the value of all commodities, bearing the impress of the authority by which it was issued, and made a standard of value. It may be in metal, in leather, or in paper. Metal is the most proper for a common measure. Every nation fixes its own impression. It is the government, the arbiter of domestic concerns, whose authority gives it currency. This is stated, in the evidence, to be false coin, — the false coin bends, the genuine does not. The genuine has silver mixed with copper; the false is made of copper alone. There is no genuine coin of Cayenne of copper alone. The witnesses specified their knowledge of this being counterfeit money. This was a contract where the goods of the vendor were valued at their true intrinsic value in current money; for which he agreed to take, and the vendee to give, not current money of the country, but foreign money at the current value in that country, by whose authority it purported to have been issued. The sample delivered was not delivered as a sample of the quality of the article or metal, but a sample designating a species of currency, to ascertain what the value of such species of currency was in that country. It is the case, in principle, of a man going into another man’s house, and saying, “I will take your goods at the selling price, if you will take my Kentucky notes at the passing value in Kentucky.” Time is given to make the inquiry; the passing value is ascertained; the notes are accepted in payment of the goods at that value; the goods are delivered; but, instead of being genuine Kentucky bank notes, they turn out to be counterfeit. On every principle, the contract is null, and the party may rescind it. It can make no difference whether the false representation of value be impressed on the metal, or expressed on paper; was a counterfeit bank note or counterfeit coin. The case of Young v. Mams before referred to, shows what would be the right of the vendor in case of receiving counterfeit bank notes. There the action was riot on a warranty,' or for the deceit, but assumpsit. In fact, there was neither deceit nor representation, and the argument opposed to the recovery was the same as it is here, — because the bank notes, when they are offered in payment and accepted, without any warranty of their genuineness by the payor, as he is not prove-itbly guilty of knowing them to be false, the receiver takes at his own risk, and has no remedy for any mistake. But the court repelled this harsh and impure doctrine in a very able opinion de *62 livered by Mr. Justice Sewell. The only ease I can find in the English books, is that of Vance v. Stedley, cited in Wade’s Case, 5 Co 115, where a lessee paid his rent to his lessor, who received it and put it into his purse; and immediately after, on looking at it again, he found the money had some counterfeit pieces, and therefore he refused to carry it away, but re-entered for the condition broken. It was adjudged that the entry was not lawful; for when the lessee had accepted the money, it was at his own peril, and after the allowance he shall not take exception to any part of it. Judge Sewell gives a very satisfactory answer to this. It was so decided, not because it was a good discharge of the debt, but because payment of the rent being accepted, it was understood as a saving of-the lessee’s forfeiture, and is not a decision that the lessor had no remedy for the deficiency in the money paid; And every body knows that it is not a satisfaction of the debt, no matter whether counterfeit foreign coin, or legalized currency; whether doubloons or pistoles, rubles or stivers, eagles or dollars, the payment would not be good.
The reason why acceptance of a forged check concludes the ac* ceptor, is because he is presumed to know the handwriting of the drawer, and takes upon himself that knowledge; but a man who takes Cayenne money is not presumed to know that it is genuine, when it is offered to him. It is offered to him, because it represents itself to be a genuine currency of the country whose impress it bears, and he takes it on the faith of that representation. In a cause decided at the last session of the southern district of this court, a bank bill was taken in payment for goods, which turned out to be counterfeit. The action for the goods was held to be maintainable; but it was decided, that the vendor having kept the bill many months after it was discovered to be counterfeit, and the defendant, his neighbour, never informed of this, nor demand made, nor offer to return the bill, could not recover, because, had he returned it seasonably, the vendee might have had recourse to the man from whom he got it; but, after such a lapse of time, all recollection, or possibility of recovery would be done away. At first my impression was, that the plaintiffs were barred by so long keeping the article; but, on reflection, the article being of no value, the country a remote one, and, for aught that appeared, this being the first vessel to this port from that distant clime, and it being in the power of a man who had bought a barrel of this counterfeit money to recollect from whom he received it, iny opinion is, that it should be left to the jury to determine whether there has been such negligence on the part of the plaintiffs to inform themselves, that the defendant might reasonably be supposed to be prejudiced; and, if they so found, that the verdict should be for the defendant. If that were not the case, my opinion is, that in this course of dealing, the article not being the money of any country, a counterfeit coin, exposing the man who offered to pass it in Cayenne to the *63 gallows, if the plaintiffs gave evidence of information in a reasonable time after they knew it was not genuine to the defendant, and demanded the price'of the goods, they could sustain the action in this form, and that without carrying the worthless trash to the defendant’s counting-house,and makingaformal tenderofit. Thejury, under all the circumstances, ought to say whether the plaintiffs have been guilty of negligence, in not sooner informing the defendant that the coin was base, by which he has been prejudiced, and whether the return of the metal could at any time have bettered his situation. If this had been an exchange, as the District Court would seem to have thought it, the defendant would still be liable. In Jones v. Ryder, 5 Taunt. 492, the court considered the transaction in the nature of an exchange. The defendant possessing a money bill professing o be a general money bill, and representing it as such, the plai ff gave him in exchange therefor a sum of mo,ney equivalent to the amount, supposing the bill to be genuine. The bill turned out to be forged, — the plaintiff brought his action as for money nad and received to his use, and the action was sustained. Both parties said the court were mistaken in the view they had of money bills. Upon its turning out the bill was forged, the money ought to have been refunded. A case was referred to as decisive, by Chief Justice Mansfield at Nisi Prius, namely, where forged bank notes are taken, the party negotiating them is not and does profess to be answerable, that the Bank of England shall pay the notes, but he is answerable for the bills being such as they purport to be. The principle was acknowledged in The U. S. Bank v. Bank of Georgia, 10 Wheat. 333, — that a payment received in forged paper or a base coin, is not good, and if there be no negligence in the párty, he can recover back the consideration paid for them, or sue upon his original demand. Negligence, in the case of forged paper, absolves the payee from all responsibilitj’; but this widely differs from an exchange of base coin in a box or barrel. In the case of forged bank notes, the holder, under such circumstances, may not be able to ascertain from whom he received them, or the situation of the other parties may be changed; but here, if it appeared that the first opportunity when offered to ascertain the genuineness of the coin was embraced, and notice given, there could be no negligence. In this ease, if the defendant is to be absolved from liability, it is by showing that he acquired the article bona fide as foreign money .from the party from whom he received it, and then if the jury find negligence in the plaintiffs, it may discharge the defendant. In that case, in an exchange like the present, the law would presume a damage, either actual or probable, sufficient to repel the claim' against him.
Judgment reversed, and a venire facias de novo awarded.

 13 Serg. & Rawle, 318.